**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| Fabian Sean DeLeon, Jr., | § | |
|        Plaintiff, | § | |
| | § | CASE NO. 5:21-cv-00146 |
| | § | |
| v. | § | |
| | § | |
| Experian Information Solutions, Inc.; | § | |
| Equifax Information Services, LLC; | § | |
| Capital One Bank (USA), National | § | |
| Association; Security Service Federal | § | |
| Credit Union; and DOES 1 through 100 | § | |
| inclusive, | § | |
| | § | |
| | § | |
| | § | |
|        Defendants. | § | |

COMES NOW Plaintiff **FABIAN SEAN DELEON, JR.** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debts.

2. Defendant Security Service Federal Credit Union ("Security Service") is inaccurately reporting Plaintiff's accounts.

3. Defendant Capital One Bank (USA), National Association ("Capital One") is inaccurately reporting Plaintiff's account.

4. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

5. Creditors intentionally and routinely ignore industry standards for accurately reporting debt information. Creditors know that deviating from recognized credit reporting

standards will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

6.      This was not the intent of Congress when it enacted the Fair Credit Reporting Act.

## JURISDICTION & VENUE

7.      Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

8.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

9.      This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

10.     Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each of the named Defendants conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

11.     Plaintiff alleges that two of his Security Service accounts are being reported as a charge off more than once, which is inaccurate. Further, Plaintiff alleges one of the Security Service accounts was settled and legally paid in full for less than the full amount on or about April of 2020 and is not currently a charged off debt.

12.     Plaintiff alleges that his Capital One account is being reported as a charge off more than once, which is inaccurate. Further, Plaintiff alleges the Capital One account was settled and legally paid in full for less than the full amount in April of 2020 and is not currently a charged off debt. Plaintiff alleges Capital One confirmed this account as settled via an email sent on April 17, 2020 (the "Capital One Payoff Letter").

13.     Plaintiff alleges that a "CO" or charge off is a one-time event, and a single debt cannot be charged off repeatedly.

14.     Experian states that a "'Charge Off' means that the credit grantor wrote your account off of their receivables as a loss, and it is closed to future charges." A credit grantor is not allowed to write off a single debt twice as that would be afoul of the Internal Revenue Service. It is technically inaccurate to report a "charge off" every month, because the data furnisher cannot write an account off on their receivables on a continues basis. *See* https://www.experian.com/blogs/ask-experian/what-does-charge-off-mean/.

15.     Once a debt is charged off, the payment history of that debt cannot be updated on a monthly basis to "continue to reflect the charge off". This type of reporting cannot be acceptable under the FCRA as, in addition to being patently incorrect, the repeated charge offs compound the derogatory impact as seen by the tally of the total number of charge offs on a given account which is listed in the account summary.

16.     Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

17.     Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized industry standard.

18.     Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard for credit reporting industry standards to purposefully undermine Plaintiff's ability to repair his FICO Score.

19.     In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

20.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.      FICO, Inc.**

21.     FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

22.     The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.

23.     A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

//

24.     Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

25.     Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

26.     There are twenty-eight (28) FICO Scores that are commonly used by lenders.

27.     A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

28.     The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

29.     FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with credit reporting industry standards.

30.     There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

31.     Each of the five (5) factors is weighted differently by FICO.

32.     In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

33.     Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

34.     Repeated derogatory payment history (e.g., repeated monthly "CO" notations) increases the recency and frequency calculation; therefore, repeated negative items in the payment history is more sever and detrimental to a FICO Score.

35.     In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

//

36.     Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

37.     FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

38.     A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See https://www.myfico.com/credit-education/what-is-a-fico-score.* If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See Id.*

**B.     Metro 2**

39.     The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening, and collection services industries.

40.     The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by CDIA to universally report debts in a particular manner that is understood to be the most accurate in reporting a debt. In other word, the Metro 2 format was designed to allow reporting of the most accurate and complete information on consumers' credit history.

41.     The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting. While CDIA's Metro 2 format is intended to standardize credit reporting, this standard is still subject to the FCRA's requirement of *maximum possible accuracy and completeness.*

42.     The credit reporting industry at large depends upon the Metro 2 format and the CDIA's recommendations for reporting debt accurately.

//

43.     The CDIA is an expert on accurate credit reporting. In support of this allegation, Plaintiff avers the following:

    a.     The CDIA offers a FCRA certificate program for all CRAs.

    b.     The CDIA offers a FCRA awareness program for all CRAs.

    c.     The CDIA offers a FCRA certificate program for DFs.

    d.     The CDIA offers a FCRA awareness program for DFs.

    e.     The CDIA offers a Metro 2 learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 format as well as the relationship between multiple fields.

    f.     The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.

    g.     The CDIA developed a credit reporting resource guide for accurately reporting credit.

44.     The CDIA's Metro 2 format is accepted by all CRAs.

45.     The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide ("CRRG").

46.     The CRRG outlines the industry standards for accurately reporting debts using Metro 2 format.

47.     The CRRG is not readily available to the public. It can be purchased for $229.45.

48.     Even if a buyer is ready, willing, and able to pay for the CRRG, the CDIA will <u>not</u> grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

49.     When FICO calculates credit scores, the algorithms use Metro 2 information based on industry standards established by the CDIA.

50.     The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

51.     If the Metro 2 data received by FICO deviates from industry standards, an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk resulting in less favorable lending terms.

//

**C.     e-OSCAR**

52.      e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

53.      When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

54.      The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

**D.     Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

55.      On or about October 29, 2020, Plaintiff ordered a three-bureau credit report from Experian to ensure proper reporting by Plaintiff's creditors (the "October 29 Credit Reports").

56.      Plaintiff noticed adverse tradelines in his October 29 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with credit reporting industry standards.

57.      Plaintiff then disputed the inaccurate tradelines via certified mail to Experian and Equifax on or about December 23, 2020 (the "Dispute Letters").

58.      Plaintiff's Dispute Letters specifically put Security Service on notice that Plaintiff's accounts are inaccurately reporting with multiple charge off notations in the payment history and should be updated. Plaintiff's Dispute Letters also put Security Service on notice that Plaintiff settled one his accounts for less than the full amount, and the reporting should be updated to reflect the settlement.

59.      Plaintiff's Dispute Letters specifically put Capital One on notice that Plaintiff's account is inaccurately reporting with multiple charge off notations in the payment history and should be updated. Plaintiff's Dispute Letters also put Capital One on notice that Plaintiff settled his account for less than the full amount, and the reporting should be updated to reflect the settlement. Plaintiff included a copy of the Capital One Payoff Letter with his disputes.

60.      Plaintiff's Dispute Letters also detailed what was perceived to be problematic about the accounts, addressing each tradeline individually.

61.      Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

62.     Plaintiff is informed and believes that Experian and Equifax each received Plaintiff's Dispute Letters and, in response, sent Plaintiff's disputes to First Premier, as the data furnisher, via an ACDV through e-OSCAR.

63.     On February 2, 2021, Plaintiff ordered a second three-bureau credit report from Experian to determine if his accounts were updated.

**a.      Inaccuracy – Security Service**

64.     Despite actual knowledge, Security Service continued to report one of Plaintiff's accounts, beginning in 569153XXXX ("Security Service Account #1"), to Equifax with a "CO" for charge off for each month from June of 2019 through April of 2020, and with a current payment status tradeline of "Charge-off" even though the account was legally paid or settled for less than the full amount on or about April of 2020. This payment history is patently inaccurate as a debt can only be charged off one time and not recurring on a monthly basis. In addition, the charge off payment status is patently inaccurate as the debt was paid.

65.     Despite actual knowledge, Security Service continued to report a second account Plaintiff's, beginning in 540656XXXXXXXXXXX ("Security Service Account #2"), to Equifax with a "CO" for charge off for each month from April of 2019 through December of 2020. This payment history is patently inaccurate as a debt can only be charged off one time and not recurring on a monthly basis.

66.     Despite actual knowledge, Security Service continued to report Security Service Account #2, to Experian with a "CO" for charge off for each month from March of 2019 through January of 2021. This payment history is patently inaccurate as a debt can only be charged off one time and not recurring on a monthly basis.

67.     Plaintiff alleges that Security Service did not investigate whether Plaintiff previously settled the Security Service Account #1 and continued to inaccurately report a charge off to Equifax despite acknowledging the account was "Legally paid in full for less than the full balance" via its reporting to Experian. Further, Security Service acknowledged the account as "Paid charge off" and "Settlement accepted on this account" in the comments to Equifax, but failed to update the payment status to reflect the same.

68.     Security Service did not update the tradeline of Security Service Account #1 to reflect that Plaintiff settled the account for less than the full amount, nor did Security Service update the tradelines to remove the multiple charge offs on either account.

69.     The account summary for Security Service Account #1, directly under the Security Service account name header on Plaintiff's credit report says, "11 charge-offs". This type of reporting is patently inaccurate and each of these charge offs is increasing the frequency and recency of the derogatory reporting, and therefore, compounding the negative impact of Plaintiff's FICO Score.

70.     The account summary for Security Service Account #2, directly under the Security Service account name header on Plaintiff's Equifax credit report says, "21 charge-offs", and on Plaintiff's Experian credit report says, "23 charge-offs". This type of reporting is patently inaccurate and each of these charge offs is increasing the frequency and recency of the derogatory reporting, and therefore, compounding the negative impact of Plaintiff's FICO Score.

71.     Experian and Equifax both provided notice to Security Service that Plaintiff was disputing the inaccurate and misleading information, but Security Service failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

72.     The most basic investigation would include a simple review of well-established credit reporting industry standards on how to report a debt legally paid or settled for less than the full amount.

73.     Plaintiff alleges that Security Service did not review well-established industry standards for credit reporting.

74.     If Security Service reviewed such standards, Security Service would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

75.     The term "charge-off" means an account is closed, although the debt is still owed and may be sent to collections. By continuing to report Plaintiff's Security Service Account #1 with a current payment status tradeline of "charge-off", it incorrectly appears to third parties viewing Plaintiff's credit report that the account was not paid or settled for less than the full amount, which is inaccurate.

76.     By continuing to report Plaintiff's Security Service Account #1 with a "CO" for charge off for each month from June of 2019 through April of 2020, and continuing to report Plaintiff's Security Service Account #2 with a "CO" for charge off for each month from April of 2019 through December of 2020 to Equifax and for each month from March of 2019 through January of 2021 to Experian, Security Service is compounding the derogatory impact on Plaintiff's

FICO Score. This type of reporting has adversely affected Plaintiff when potential lenders were making credit decisions regarding Plaintiff and their willingness to extend credit.

77.     Security Service can write off a single debt only once; however, it reported a monthly charge off for eleven (11) straight months regarding the Security Service Account #1, for twenty-one (21) straight months regarding the Security Service Account #2 to Equifax, and for twenty-three (23) straight months regarding the Security Service Account #2 to Experian. This is inaccurate and misleading and causes specific harm to Plaintiff's FICO score and his ability to obtain new credit.

78.     As payment history (where the multiple charge offs are being reported) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to pouring through each tradeline of every account listed to obtain context), the incorrect and repeated "CO" payment history reported by Security Service is lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

79.     Security Service's lack of investigation is unreasonable, and its reporting is negatively impacting Plaintiff's credit score.

**b.     Inaccuracy – Capital One**

80.     Despite actual knowledge, Capital One continued to report Plaintiff's account, beginning in 517805XXXXXX, to Equifax with a "CO" for charge off for each month from June of 2019 through April of 2020, and with a current payment status tradeline of "Charge-off" even though the account was legally paid or settled for less than the full amount in April of 2020. This payment history is patently inaccurate as a debt can only be charged off one time and not recurring on a monthly basis. In addition, the charge off payment status is patently inaccurate as the debt was paid.

81.     Despite actual knowledge, Capital One continued to report Plaintiff's account, beginning in 517805XXXXXX, to Experian with a "CO" for charge off for each month from May of 2019 through May of 2020. This payment history is patently inaccurate as a debt can only be charged off one time and not recurring on a monthly basis.

82.     Plaintiff alleges that Capital One did not investigate whether Plaintiff previously settled the account and continued to inaccurately report a charge off to Equifax despite acknowledging the account was "Legally paid in full for less than the full balance" via its reporting

to Experian. Further, Capital One acknowledged the account as "Paid charge off" and "Settlement accepted on this account" in the comments to Equifax, but failed to update the payment status to reflect the same.

83.     Capital One did not update the tradeline to Equifax to reflect that Plaintiff settled the account for less than the full amount, nor did Capital One remove the multiple charge offs on its reporting to Experian or Equifax.

84.     The account summary directly under the Capital One account name header on Plaintiff's Equifax credit report says, "11 charge-offs", and on Plaintiff's Experian credit report says, "13 charge-offs". This type of reporting is patently inaccurate and each of these charge offs is increasing the frequency and recency of the derogatory reporting, and therefore, compounding the negative impact of Plaintiff's FICO Score.

85.     Experian and Equifax both provided notice to Capital One that Plaintiff was disputing the inaccurate and misleading information, but Capital One failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

86.     Plaintiff alleges Capital One did not review its internal records or the copy of the Capital One Payoff Letter that it generated and sent to Plaintiff acknowledging the debt as settled.

87.     The most basic investigation would include a simple review of well-established credit reporting industry standards on how to report a debt legally paid or settled for less than the full amount.

88.     Plaintiff alleges that Capital One did not review well-established industry standards for credit reporting.

89.     If Capital One reviewed such standards, Capital One would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

90.     The term "charge-off" means an account is closed, although the debt is still owed and may be sent to collections. By continuing to report Plaintiff's account to Equifax with a current payment status tradeline of "charge-off", it incorrectly appears to third parties viewing Plaintiff's credit report that the account was not paid or settled for less than the full amount, which is inaccurate.

91.     By continuing to report Plaintiff's account with a "CO" for charge off for each month from June of 2019 through April of 2020 to Equifax and for each month from May of 2019 through May of 2020 to Experian, Capital One is compounding the derogatory impact on

Plaintiff's FICO Score. This type of reporting has adversely affected Plaintiff when potential lenders were making credit decisions regarding Plaintiff and their willingness to extend credit.

92.     Capital One can write off the debt only once; however, it reported a monthly charge off for eleven (11) straight months to Equifax and for thirteen (13) straight months to Experian. This is inaccurate and misleading and causes specific harm to Plaintiff's FICO score and his ability to obtain new credit.

93.     As payment history (where the multiple charge offs are being reported) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to pouring through each tradeline of every account listed to obtain context), the incorrect and repeated "CO" payment history reported by Capital One is lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

94.     Capital One's lack of investigation is unreasonable, and its reporting is negatively impacting Plaintiff's credit score.

**E.     Damages**

95.     Plaintiff pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

96.     As a result of the incorrect reporting, Plaintiff has also suffered emotional harm and excessive stress resulting in doubt as to the effectiveness of the Fair Credit Reporting Act and the power of this Court to preserve his right to a complete and accurate credit report.

97.     Plaintiff has been denied credit and is unable to rebuild his credit based on the inaccurate reporting by Defendants.

98.     Security Service's and Capital One's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

**FIRST CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))**

**(Against Defendants and Does 1-100)**

99.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     Experian and Equifax Each Failed to Assure Credit Reporting Accuracy**

100.     Experian and Equifax (collectively, the "CRA Defendants") each violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum

possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

101.    Had Experian and Equifax each maintained reasonable procedures to assure maximum accuracy, each would never have never allowed Security Service or Capital One to report their respective accounts as described herein.

102.    Equifax knew, or should have known, (1) that the Security Service Account #1 was paid or settled for less than the full amount on or about April of 2020, (2) that the Capital One account was paid or settled for less than the full amount in April of 2020, and (3) that the neither the Security Service Account #1 nor the Capital One account should have been reported with a current payment status tradeline of "charge-off" on account of the settlements. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

103.    In addition, Equifax knew, or should have known, (1) that the Security Service accounts and the Capital One account could each only be charged off once as the same debt cannot be charged off each month on a continuous basis, and (2) that reporting a charge off on each account month after month was increasing the frequency and recency of the derogatory reporting which was having a compounding, negative effect on Plaintiff's FICO Score. Further, Equifax knew, or should have known, that these inaccurate and incomplete tradelines do not reflect *maximum possible accuracy and completeness* as required by the FCRA.

104.    Experian knew, or should have known, (1) that the Security Service accounts and the Capital One account could each only be charged off once as the same debt cannot be charged off each month on a continuous basis, and (2) that reporting a charge off on each account month after month was increasing the frequency and recency of the derogatory reporting which was having a compounding, negative effect on Plaintiff's FICO Score. It is stated on Experian's own website that a "charge off" is a "write off" by a data furnisher. Further, Experian knew, or should have known, that these inaccurate and incomplete tradelines do not reflect *maximum possible accuracy and completeness* as required by the FCRA.

105.    Experian is trying to have its cake and eat it too. On one hand, it wants to allow data furnishers to inaccurately and misleadingly report multiple charge offs on a consumer's credit report, and on the other, it provides conflicting information to consumers when it states "the credit grantor wrote your account off of their receivables as a loss, and it is closed to future charges."

Specifically, in this case, Experian allowed inaccurate and misleading information, the rolling charge off, to be reported on Plaintiff's credit report that has damaged her reputation.

106. Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers." *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019). The investigation and evaluation of Plaintiff's credit worthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the rolling charge offs that Experian and Equifax allowed.

107. As a result of the CRA Defendants' violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

**B.    Willful Violations**

108. The CRA Defendants' violations, as described herein, were willful; specifically, the CRA Defendants have intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

109. The CRA Defendants regularly, as a policy, ignore disputes by consumers and fail to perform even a basic investigation regarding the disputes. Additionally, the CRA Defendants regularly fail to forward disputes to data furnishers, thereby frustrating the entire dispute process.

110. To the extent the CRA Defendants do send consumer disputes, they send these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

111. The CRA Defendants' employees receive little to no training concerning how to accurately report consumer debt.

112. Instead, the CRA Defendants' employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

113. The CRA Defendants' employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

//

114.    The CRA Defendants have intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

115.    As a result of the CRA Defendants' violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

116.    The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

117.    In the alternative, the CRA Defendants were each negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

118.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**SECOND CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))**

**(Against Defendants and Does 1-100)**

119.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Security Service Failed to Reinvestigate Following Plaintiff's Dispute**

120.    Pursuant to 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

121.    Security Service violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading, inaccurate, and incomplete account information.

122.    Experian and Equifax each provided notice to Security Service that Plaintiff was disputing the misleading, inaccurate, and incomplete information on both accounts; however, Security Service failed to conduct a reasonable investigation as required by the FCRA.

123.    Based on Plaintiff's disputes and review of its internal records, Security Service should have known Security Service Account #1 was paid or settled less than the full amount and ceased its inaccurate reporting.

124.    In addition, based on Plaintiff's disputes, Security Service should have known its accounts could not be charged off multiple times on a monthly basis and ceased its inaccurate reporting. Further, Security Service understands that frequency and recency of reporting in the payment history are directly tied to a factor which accounts for over one-third of a consumer's FICO Score calculation.

125.    A single debt can only be charged off one time and, if a debt is charged off, it should only be reported for a single month in which the debt was actually charged off. Once a debt is charged off, the payment history reporting on that debt should cease (absent subsequent payment). As a single debt cannot be charged off multiple times, reporting as such is patently incorrect.

126.    This type of inaccurate reporting can also adversely affect credit decisions. Payment history (where the multiple charge off notations are being reported), at thirty-five percent (35%), is the heaviest weighted factor that goes into calculating a FICO score. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. If a charge off is repeated for months on end, it is increasing the frequency of derogatory payment history as well as the recency; both compounding to lower a FICO Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported FICO Score and do not take the time to look through each tradeline of every account listed to obtain context.

127.    Based upon the foregoing, Plaintiff alleges Security Service's reporting of multiple charge offs of the same debt throughout the payment history of a single account has a direct adverse effect on Plaintiff's FICO Score and his ability to obtain credit.

128.    Security Service's lack of investigation, as required by the FCRA, is unreasonable.

**B.    Capital One Failed to Reinvestigate Following Plaintiff's Dispute**

129.    Pursuant to 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

130.    Capital One violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading, inaccurate, and incomplete account information.

//

//

131.    Experian and Equifax each provided notice to Capital One that Plaintiff was disputing the misleading, inaccurate, and incomplete information on both accounts; however, Capital One failed to conduct a reasonable investigation as required by the FCRA.

132.    Based on Plaintiff's disputes and review of its internal records, Capital One should have known its account was paid or settled less than the full amount and ceased its inaccurate reporting.

133.    In addition, based on Plaintiff's disputes, Capital One should have known its account could not be charged off multiple times on a monthly basis and ceased its inaccurate reporting. Further, Capital One understands that frequency and recency of reporting in the payment history are directly tied to a factor which accounts for over one-third of a consumer's FICO Score calculation.

134.    A single debt can only be charged off one time and, if a debt is charged off, it should only be reported for a single month in which the debt was actually charged off. Once a debt is charged off, the payment history reporting on that debt should cease (absent subsequent payment). As a single debt cannot be charged off multiple times, reporting as such is patently incorrect.

135.    This type of inaccurate reporting can also adversely affect credit decisions. Payment history (where the multiple charge off notations are being reported), at thirty-five percent (35%), is the heaviest weighted factor that goes into calculating a FICO score. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. If a charge off is repeated for months on end, it is increasing the frequency of derogatory payment history as well as the recency; both compounding to lower a FICO Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported FICO Score and do not take the time to look through each tradeline of every account listed to obtain context.

136.    Based upon the foregoing, Plaintiff alleges Capital One's reporting of multiple charge offs of the same debt throughout the payment history of a single account has a direct adverse effect on Plaintiff's FICO Score and his ability to obtain credit.

137.    Capital One's lack of investigation, as required by the FCRA, is unreasonable

**C.    Willful Violations**

138.    Plaintiff further alleges that Security Service and Capital One have not properly trained those directly investigating disputes on Metro 2 generally, credit reporting industry

standards, or the accuracy and completeness FCRA standard and, as such, have developed reckless policies and procedures.

139.   Plaintiff alleges that rather than train its employees on accurate credit reporting and industry standards, Security Service's and Capital One's employees tasked with reviewing disputes are expected to confirm the information being reported as accurate instead of investigating the reporting.

140.   Creditors like Security Service and Capital One commonly use credit reporting as a means of deemed "retribution" upon consumers who do not or cannot pay. Thus, Plaintiff alleges Security Service's and Capital One's reporting as described herein are attempts to have the most detrimental impact on his FICO Score, and, due to the factors and weights which comprise a FICO Score, is succeeding in doing so by the increased frequency and recency of derogatory charge off notations.

141.   In addition, the fact that Security Service reported the Security Service Account #1 payment status correctly to Experian and even included a comment to Equifax that the account was in fact settled and paid, its reporting to Equifax of "Charge off" as the current payment status further shows willfulness on its part.

142.   In addition, the fact that Capital One reported the payment status of its account correctly to Experian and even included a comment to Equifax that the account was in fact settled and paid, its reporting to Equifax of "Charge off" as the current payment status further shows willfulness on its part.

143.   In the alternative, Security Service and Capital One were each negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

**D.   The CRA Defendants Each Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

144.   Pursuant to 15 U.S.C. 1681i(a)(1), the CRA Defendants were each required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Security Service accounts and the Capital One account.

145.   Thus, the CRA Defendants each failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

146.    The CRA Defendants are not passive entities bound to report whatever information a data furnisher provides.

147.    Plaintiff alleges the CRA Defendants are readily familiar with Metro 2 guidelines and credit reporting industry standards.

148.    Based on the foregoing, Plaintiff alleges that the CRA Defendants can, and do, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

149.    The CRA Defendants can and do instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

150.    The CRA Defendants each failed to conduct a reasonable investigation because any basic investigation would have uncovered that Security Service and Capital One were not reporting their respective accounts at issue correctly.

151.    Had Equifax conducted a proper investigation, it could have corrected the Security Service Account #1 debt and the Capital One debt by suppressing the inaccurate payment status since the debts were each in fact paid or settled for less than the full amount. In addition, Equifax could have removed the multiple, monthly charge offs on each of the Security Service accounts and the Capital One account.

152.    Equifax continued to report the Security Service accounts as described in paragraphs 64-65, and continued to report the Capital One account as described in paragraph 80.

153.    Had Experian conducted a proper investigation, it could have removed the multiple, monthly charge offs on the Security Service account and the Capital One account.

154.    Experian continued to report the Security Service account as described in paragraph 66, and continued to report the Capital One account as described in paragraph 81.

155.    The CRA Defendants, therefore, did not conduct even the most basic investigations regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

### THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Defendants and Does 1-100)

156.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  The CRA Defendants Each Failed to Review and Consider all Relevant Information**

157.    The CRA Defendants each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

158.    The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.  Willful Violations**

159.    The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

160.    In the alternative, the CRA Defendants were each negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

161.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**FOURTH CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))**

**(Against Defendants and Does 1-100)**

162.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  The CRA Defendants Each Failed to Delete Disputed and Inaccurate Information**

163.    The CRA Defendants each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

164.    The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.  Willful Violations**

165.    The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

//

166.     In the alternative, the CRA Defendants were each negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

167.     Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

168.     WHEREFORE, Plaintiff prays for judgment as follows:

a.  For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

b.  Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

c.  Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

d.  Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

e.  For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

f.  For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.


Respectfully submitted,


**SCHUMACHER LANE PLLC**


Dated: February 13, 2021              */s/ Kyle Schumacher*
                                       Kyle Schumacher
                                       Attorney for Plaintiff

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands trial of this matter by jury.


**SCHUMACHER LANE PLLC**


Dated: February 13, 2021

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorney for Plaintiff